1  Andrew P. Holland/Bar No. 224737
   aholland@thoits.com
2  Nathaniel H. Lipanovich/Bar No. 292283
   nlipanovich@thoits.com
3  **THOITS LAW**
   A Professional Corporation
4  400 Main Street, Suite 205
   Los Altos, California 94022
5  Telephone:  (650) 327-4200
   Facsimile:  (650) 325-5572
6
7  **Anthony J. Hornbach (*pro hac vice* forthcoming)**
   tony.hornbach@thompsonhine.com
   **Thompson Hine LLP**
8  312 Walnut Street, 14th Floor
   Cincinnati, Ohio 45247
9  Telephone:  (513) 352-6721
   Facsimile:  (513) 241-4771
10
   Attorneys for Plaintiff
11 **OWC Santa Cruz Mfg LLC**

12              **UNITED STATES DISTRICT COURT**

13             **NORTHERN DISTRICT OF CALIFORNIA**

14

15  OWC SANTA CRUZ MFG LLC,            Case No.:   5:20-cv-05835-EJD

16              Plaintiff,             **FIRST AMENDED COMPLAINT FOR:**

17       v.                           **(1)  BREACH OF CONTRACT**
                                      **(2)  BREACH OF THE COVENANT OF**
18  MONTEREY STORAGE SOLUTIONS,        **GOOD FAITH AND FAIR DEALING**
    LLC; GIL SPENCER; BEN REWIS; and   **(3) DECLARATORY RELIEF**
19  CHRISTOPHER LOCHHEAD,              **(4) TORTIOUS INTERFERENCE WITH**
                                      **CONTRACT**
20              Defendants.            **(5) CIVIL CONSPIRACY**
                                      **(6) FRAUD**
21                                     **(7) CONSTRUCTIVE FRAUD**
                                      **(8) BREACH OF FIDUCIARY DUTY**
22

23                                     **JURY TRIAL DEMANDED**

24

25

26

27

28

                                1

THOITS LAW

Plaintiff OWC Santa Cruz Mfg LLC ("OWC"), by and through counsel, for its First Amended Complaint[1] against Defendants Monterey Storage Solutions, LLC ("MSS"), Gil Spencer, Ben Rewis, and Christopher Lochhead states as follows:

## THE PARTIES

1.  OWC is a limited liability company organized under the laws of Delaware and has its principal place of business in Ohio. OWC's only member is Openroads Wealth Capital, LLC, which is also a Delaware limited liability company with its principal place of business in Ohio.

2.  MSS is a limited liability company organized under the laws of New York. MSS's only member is Tushar Atre's Estate ("Atre's Estate"), which took ownership and control of MSS after Tushar Atre ("Atre"), MSS's former owner and lone member, passed away in 2019.

3.  OWC and MSS are the only members of non-party Interstitial Systems, LLC ("Interstitial Systems"), a California limited liability company with its principal place of business in Santa Cruz, California.

4.  Ben Rewis is an individual who resides in Oakland, California and was appointed as a board manager of Interstitial Systems by MSS and continues to serve as a manager of Interstitial Systems.

5.  Christopher Lochhead is an individual who resides in Capitola, California and was appointed as a board manager of Interstitial Systems by MSS and continues to serve as a manager of Interstitial Systems.

6.  Gil Spencer is an individual who resides in Incline Village, Nevada and was appointed as a board manager of Interstitial Systems by MSS and continues to serve as a manager of Interstitial Systems.

7.  Ben Rewis, Christopher Lochhead, and Gil Spencer are collectively referred to as the "MSS-Appointed Managers."

---

[1] OWC is entitled to amend its Complaint under Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over the issues set forth in this Complaint pursuant to 28 U.S.C. §1332 because complete diversity of citizenship exists between the parties and because the amount in controversy exceeds $75,000.

9.     The Court has personal jurisdiction over the parties because this dispute involves MSS's and OWC's membership interests in Interstitial Systems, a California limited liability company operating in Santa Cruz, California, and many of the actions from which the claims set forth in this Complaint arise occurred in California. Additionally, all Defendants except for Defendant Spencer reside in California. The Court has personal jurisdiction over Defendant Spencer because Defendant Spencer, as manager of a California-based company, Interstitial Systems, has purposefully availed himself of the jurisdiction.

10.    Venue is appropriate in this Court because the dispute before the Court relates to Interstitial Systems, which operates in the Northern District of California, and many of the actions from which the claims arise also occurred within the Northern District of California.

## BACKGROUND FACTS

11.    Interstitial Systems is a pre-revenue start-up that Atre founded for the purposes of creating and developing a cannabis-processing facility.  Interstitial Systems is located and does business in Santa Cruz, California.

12.    In November of 2018, OWC was approached about investing in Interstitial Systems, which was attempting to complete a 4,200 square foot manufacturing and distribution facility in Santa Cruz on a piece of real estate that Atre owned.

13.    Shortly after OWC was approached about the opportunity, a financial model for Interstitial Systems and pitch deck were shared with OWC.  In the materials that were provided to OWC, Interstitial Systems is described as a cannabis extracts company with type 7 and 11 licenses for highly volatile extraction and distribution and as a business that is ready to scale.

14.    The pitch deck also describes the Interstitial Systems team as experts who have large-scale processing and distribution expertise, established supply-chain relationships, and proven business operations/growth experience.  It then identifies the team as:

3

- Tushar Atre – Owner and Chairman of Interstitial Systems; described as a 20-year CEO and tech entrepreneur, the founder of Interstitial Systems, and as having 5 years of cannabis manufacturing and distribution experience.

- Brian Kelly – CEO of Interstitial Systems; described as a Silicon Valley tech entrepreneur who has served as a CEO, CMO, and CPO for several tech companies over the last two decades and who has had several successful exits, both via acquisition and IPO.

- Brian Kenny – Interstitial Systems' Head of Manufacturing; described as a Silicon Valley tech entrepreneur in product and manufacturing technology who has over 15 years of commercial cannabis manufacturing, cultivation, and processing experience that allows him to innovate, implement, and scale at rapid speeds.

15. During conversations with OWC around this same time, Atre repeatedly referred to "the team," explained the team's importance to the company, and described the team as family. OWC was also told that Atre would not be running the day-to-day operations after the facility was constructed as Brian Kelly and Brian Kenny would be overseeing all operations.

16. Atre also represented that Brian Kenny and Brian Kelly, upon OWC investing, would have an equity interest in Interstitial Systems.

17. Based on OWC's preliminary discussions with Atre, OWC was impressed with the knowledge and experience that the Interstitial Systems team had with respect to the cannabis industry.

18. In his pitch to OWC, Atre went to great lengths to sell OWC on software that he represented was part of Interstitial Systems' business. Based on what was presented, the software provided a significant competitive advantage by helping to obtain clients for Interstitial Systems and was critical to the business plan.

19. During OWC's first visit and meeting with Atre and his team, Atre demonstrated how the software would work and demonstrations of the software were provided to OWC.

20. OWC was impressed with the software as it had not seen anything else like it on the market.

4

21. Atre also stressed that he and Brian Kelly would be able to leverage their contacts and execute this part of the business.

22. During OWC's first meeting with Atre, OWC was shown plans for the facility. Atre represented that operations would begin in March of 2019, the facility would be operating at capacity by June of 2019, and Interstitial Systems would need to expand its operations by October 2019.

23. OWC also knew that the facility, even if it came to fruition, was only as good as the team that was operating it, especially since it required relationships with growers committed to using Interstitial Systems for processing their product.

24. OWC also knew that there is a sizable black market for cannabis, marijuana, and related products in California. OWC was firmly opposed to investing in any company or individual who was involved with or connected to black market operations.

25. For this reason, OWC specifically asked Atre during their discussions if he or his companies were involved with any illegal operations that participated on the black market.

26. Atre confirmed that he and his companies were not and that all of his activities were above board and legal.

27. While OWC was considering making an investment in Interstitial Systems, it recognized the importance of the leadership team, especially Brian Kelly and Brian Kenny.

28. Brian Kenny had substantial experience in the cannabis industry and had a sizable network of contacts in the industry that were important to making Interstitial Systems successful.

29. Brian Kelly had a long track record of who had experience running successful companies as well as overseeing acquisitions and successful investor exits.

30. During OWC's discussions with Atre, Atre represented to OWC that Brian Kelly and Brian Kenny would hold an investment in Interstitial Systems upon OWC investing in Interstitial Systems.

**OWC's Initial Investment in Interstitial Systems**

31.     On February 22, 2019, based on the information presented and in reliance on Atre's numerous representations, OWC purchased a 27.5% membership interest in Interstitial Systems in exchange for $2.75 million (at a $10 million valuation) with an option to invest an additional $1.5 million in the future for a total interest of 42.5%.

32.     Prior to the sale, Atre transferred his entire membership interest in Interstitial Systems to MSS, an entity that Atre owned, controlled, and operated in its entirety.

33.     After the February 22, 2019 closing and OWC's $2.75 million investment, OWC owned 27.5% of Interstitial Systems and MSS owned the remaining 72.5%.

**The Interstitial Systems' Operating Agreement**

34.     On or around February 22, 2019, OWC and MSS entered into the Amended and Restated Operating Agreement of Interstitial Systems LLC (the "Operating Agreement"), which is attached to the Complaint as Exhibit A and is incorporated herein by reference.

35.     Pursuant to the Operating Agreement, MSS was permitted to appoint three managers to Interstitial Systems' Board and OWC was permitted to appoint two.   *See* Operating Agreement at §2.3.

36.     The Operating Agreement also required, among other things, that Interstitial Systems' Board was required to authorize Interstitial Systems incurring "any aggregate indebtedness in excess of $25,000 that is not already included in" an approved budget, to hire or fire an officer, and "to enter into any corporate strategic relationship outside the ordinary course of business involving the payment contribution or assignment by the Company or to the Company of assets greater than $25,000." *See id.* at §2.17.

37.     Furthermore, the Operating Agreement mandated that certain actions require "the affirmative vote of a majority of the Managers then serving on the Board," along with one affirmative vote of at least one Manager that OWC appointed.  These included, among other items, the approval of the annual budget, changing the compensation of the Officers by more than 10%, and changing the principal business of Interstitial Systems, entering new lines of business, or exiting the current line of business. *See id.* at §2.18.

38. The Operating Agreement also established that any "change of control" of OWC or MSS shall trigger an option to purchase the changed party's membership interest by the other party that can be exercised upon written notice. *Id.* at §6.1. If the option is exercised, the party exercising the option shall pay an amount agreed upon by the parties or an amount based on the fair market value of the membership interest as of the date of the triggering event as established by an appraiser. *Id.*

39. Once the appraiser establishes an amount for the membership interest, the amount is payable via "[a]n unsecured promissory note [made payable] to the Transferring Member for the balance of the purchase price [and] shall be payable over a 5-year period in 20 consecutive and equal calendar year quarter installments, including interest [at the] prime rate of interest of major banks." *Id.* at §6.1.

40. According to the Operating Agreement, the appraiser is to perform the appraisal within 45 days of being selected, and the closing shall take place no later "than 30 days after the exercise of the operable option to purchase and the determination of the purchase price. . . ." *Id.*

41. The Operating Agreement further provides that the "Members and Managers understand and agree that any Member may suffer irreparable damage if this Agreement is not specifically performed according to the terms of this Agreement" and that all "Members agree that all of the terms of this Agreement shall be enforceable in a court having equity jurisdiction by a decree of specific performance or by injunction or by both; *provided, however*, that the foregoing shall not be construed as prohibiting any of the Members from pursuing any additional remedies for a breach or threatened breach . . . ." *Id.* at §13.5 (emphasis in original).

**Atre and MSS Concealed Brian Kelly's and Brian Kenny's Separations and Other Information to Induce OWC Into Making Additional Investments in ITS**

42. In March of 2019, shortly after OWC made the initial investment in Interstitial Systems, Brian Kelly and Atre had a disagreement, and Brian Kelly decided to part ways with Interstitial Systems.

43.     However, Atre and MSS never informed OWC of this fact.   Instead, Atre and MSS made it appear as if Kelly was still working as part of the management team, would tell OWC that Kelly was traveling, and took other actions to make sure that Kelly's departure did not scare off OWC from making additional investments in Interstitial Systems.

44.     Atre and MSS also provided OWC with updates regarding the software that Atre previously represented to OWC belonged to Interstitial Systems and using analysis from the software to help analyze data and other information.

45.     For example, in a March 26, 2019 email to OWC, Atre and MSS described one of the "legs of the business" as being the Cannabis software that was previously presented and described as part of Interstitial Systems prior to OWC making its original investment.  A true and accurate copy of the March 26, 2019 email is attached as Exhibit B and incorporated herein by reference.

46.     In addition, in an April 22, 2019 email, Atre and MSS again described as one of Interstitial Systems' "4 legs to business" being "market intelligence" and referred to the Cannabis software as being Interstitial Systems' "internal auditing tool," stating:

> You have seen our Cannalysis report before.  It's a combination of data points, and meta-analysis.  We're upgrading its capability with lead list technology.  This platform helps brands identify which stores and geographic areas offer the best opportunities and where there may be saturation.  Generated lead lists give clients a prioritized set of stores to target in their sales efforts instead of shooting in the dark or working through organic growth.  Target launch in July.

A true and accurate copy of the April 22, 2019 email is attached as Exhibit C and is incorporated herein by reference.

47.     In reliance on the information that Atre and MSS provided to OWC regarding Interstitial Systems, OWC decided to invest an additional $1.5 million in Interstitial Systems, resulting in it owning a 42.5% membership interest in the company.  This amount was paid in $250,000 installments beginning on April 11, 2019 and concluding on May 23, 2019.

48.     However, in late May of 2019, only after securing OWC's investments in Interstitial Systems did Atre and MSS then inform OWC that Brian Kelly had agreed to part ways and return to the tech industry.

49.     Similarly, Brian Kenny also had decided to leave Interstitial Systems in early May of 2020, which was also not disclosed to OWC until an on-site visit after it completed its investments revealed unfamiliar personnel working at the facility.

50.     Accordingly, because Atre lacked any substantive knowledge regarding cannabis processing, everyone on the leadership team with sophisticated knowledge of the cannabis processing and extraction industry were no longer with Interstitial Systems.

51.     And, only after it discovered Brian Kelly and Brian Kelly had separated from Interstitial Systems did OWC uncover that, contrary to what Atre represented to OWC, Brian Kelly and Brian Kenny did not own an interest in Interstitial Systems either directly or indirectly through MSS.

**OWC Further Discovered That Atre And MSS Misrepresented the Status of the Software**

52.     OWC also discovered well after it made additional investments in Interstitial Systems in April and May that Interstitial Systems never owned or controlled the software like Atre had previously represented and MSS and Atre represented after OWC made its initial investment.

53.     Instead, Brian Kenny, the developer of the software, actually owned it, not Interstitial Systems.

54.     In fact, in order to cover up Atre's and MSS's misrepresentations to OWC regarding the software, MSS and Atre attempted to negotiate a last-minute deal with Brian Kenny as part of his separation with Interstitial Systems to acquire the software on behalf of Interstitial Systems.  Kenny, though, refused.

55.     Therefore, Interstitial Systems never owned the software that was referenced in the pitch deck and that Atre and MSS represented to OWC as belonging to Interstitial

9

Systems and was a "leg" of Interstitial Systems' business. Nor was it an asset that Interstitial Systems could use, develop, or market.

**After Atre Passed Away, OWC Discovered That Atre Utilized OWC's Investment to Fund Personal Interests**

56.     On October 1, 2019, Atre was murdered in Santa Cruz.

57.     After Atre passed away, OWC discovered additional information that Atre and MSS had concealed from OWC.

58.     This includes the fact that Atre and MSS utilized a good portion of OWC's investment, not for Interstitial Systems, but to fund Atre's personal activities, other business interests, and even black-market activities.

59.     For instance, despite Atre's and MSS's representations to OWC that Atre was not involved with black market activities, Atre owned property at 24575 Soquel San Jose Road in Los Gatos (the "Summit Property") where he grew and cultivated marijuana and cannabis under the guise of a research license that he and others attempted to sell on the open market.

60.     Atre and MSS utilized the manpower, resources, and funds that OWC invested in Interstitial Systems to develop, cultivate, and transport these products that Atre grew at that site.

61.     OWC also discovered that some of the individuals who Atre and MSS hired as "independent contractors" at Interstitial Systems and were paid with Interstitial System's funds were used and hired to work at the grow site.

62.     In addition, also unknown to OWC at the time, OWC discovered that Atre was using the Interstitial Systems facility and personnel to run analysis of the product that he was growing at the Summit Property.

63.     OWC further discovered after Atre's passing that Atre and MSS utilized Interstitial Systems and its resources to enter into personal deals with other companies in order to process products or with companies that had their licenses revoked.

64.     Atre entered into "handshake deals" to conduct toll processing at well below market rates, but, upon information and belief, revenues from those jobs never made it to Interstitial System's books.

65.     Instead, upon information and belief, the amounts due were paid in cash directly to Atre and MSS and not reported to Interstitial Systems or OWC.

66.     Atre and MSS utilized OWC's investment and resources to assist with efforts to build a large-scale hemp processing facility in Salinas, a facility that was a separate business interest of Atre's.

67.     Atre also utilized OWC's investment to purchase a custom machine from Nyborg Systems (the "Nyborg Machine") that Atre and MSS represented to OWC was for Interstitial Systems' use.

68.     However, upon information and belief, the machine is a prototype that Atre and MSS funded with Interstitial Systems' money to test for possible use at the Salinas facility.

69.     Upon information and belief, at the time of the purchase, Atre was in discussions to invest in Nyborg Systems and made the purchase to help those efforts and test out a prototype that could help Nyborg Systems sell similar systems in the future.

70.     In fact, upon information and belief, Atre was attempting to raise additional capital for Nyborg Systems and even loaned Nyborg Systems money.

71.     Thus, despite using OWC's investment to purchase and build the Nyborg Machine, Atre and MSS, upon information and belief, really purchased the Nyborg machine to assist Atre's other business interests.

**OWC Exercised Its Option to Purchase MSS's**

**Interest in Interstitial Systems Following Atre's Death**

72.     When Atre passed away on October 1, 2019, MSS had appointed only two of its three board managers, with one them being Atre.

73.     Atre's Estate subsequently took over Atre's interest in MSS, and shortly thereafter, MSS appeared at Interstitial Systems' place of business and took countless boxes of documents from Interstitial Systems' facility over OWC's objections, even at one point calling the police claiming that Interstitial Systems and OWC were interfering with its efforts to take documents that MSS claimed belong to it.  After the investigation into Atre's death, the police also released to MSS various Interstitial Systems' computers that were confiscated as part of the investigation.

74.     Shortly thereafter, on November 12, 2019, MSS removed Brian Kelly, the lone MSS-appointed board manager on the Interstitial Systems Board who Atre never formally replaced, and appointed the MSS-Appointed Managers, who are three friends of Atre and his family, to serve as Interstitial Systems' managers.  A true and accurate copy of the Written Consent of MSS appointing the MSS-Appointed Managers as managers of Interstitial Systems is attached as Exhibit D.

75.     On November 27, 2019, OWC exercised its right under the Operating Agreement to purchase MSS's membership interest in Interstitial Systems.  Per the terms of the Operating Agreement, OWC was required to pay MSS for the value of MSS's membership interest as of October 1, 2019, the date of Mr. Atre's death.  Accordingly, as of November 27, 2019, the value of MSS's membership interest was locked in place, and that value no longer was impacted by the success or lack of success of Interstitial Systems' business.

76.     In accordance with the procedures set forth in the Operating Agreement, after being unable to agree on a price for MSS's interest or on an appraiser, the parties each appointed an appraiser who then agreed upon a third appraiser, Ron Seigneur at Seigneur Gustafson, to value MSS's interest in Interstitial systems.

THOITS LAW

77.     In February of 2020, Seigneur Gustafson was retained to value Interstitial Systems as of October 1, 2019 and, in turn, value MSS's membership interest.

78.     Although Section 6 of the Operating Agreement mandates the completion of the appraisal within 45 days, the appraisal took several months to complete.

79.     During that time, even though MSS's membership interest no longer was tied to Interstitial Systems' performance, MSS and the MSS-Appointed Managers retained control of Interstitial Systems, took numerous actions that negatively impacted Interstitial Systems, and prevented OWC from being able to preserve its interests in Interstitial Systems. In fact, OWC submits the MSS-Appointed Managers are acting in a manner inconsistent with preserving Interstitial System's value and that their actions are actively threatening the current and long-term viability of the company.

80.     For example, on or around April of 2020, MSS and the MSS-Appointed Managers attempted to terminate the only individual performing work at Interstitial Systems and even attempted to withhold her pay to silence her with respect to the appraisal process.

81.     Moreover, on or around April 13, 2020, MSS and the MSS-Appointed Managers changed the locks on Interstitial Systems without informing OWC and failed to provide OWC with access to the facility until June 2, 2020.

82.     Despite OWC's demands, MSS also repeatedly refused to return any of the documents that it took from Interstitial Systems' place of business in November or the computers it obtained from the police. To date, MSS still has not returned these items even though they contain information relating to Interstitial Systems' business and activities and actions that Atre took while operating Interstitial Systems until his death.

83.     On June 4, 2020, OWC, anticipating the release of the appraisal, circulated to MSS a draft of a basic purchase agreement and promissory note for its review and comment. A true and accurate copy of the June 4, 2020 email is attached as Exhibit E and is hereby incorporated by reference into the Complaint.

84.     On June 9, 2020, Seigneur Gustafson issued the appraisal (the "SG Appraisal"), concluding that "the Fair Market Value of a 100% ownership interest in Interstitial Systems,

13

LLC as of October 1, 2019 is $4,500,000." The SG Appraisal also stated that this excluded the Nyborg Machine since it is a unique asset. A true and accurate copy of the SG Appraisal is attached as Exhibit F and is hereby incorporated by reference.

85.     Based on this appraisal, the amount OWC owes for MSS's interest is $2.587 million, payable pursuant to a 5-year unsecured promissory note as set forth in more detail in the Operating Agreement.

86.     On June 16, 2020, OWC and MSS, through counsel, discussed various aspects of the SG Appraisal as well as the best approach to address the Nyborg Machine. The parties were in agreement at that time that the best way to address that issue was to have OWC and MSS both attempt to market the machine, and if a mutually-agreeable offer to purchase was found, then they would split the proceeds of that sale in accord with their ownership interests. After all, it is in both parties' best interest to try to sell the Nyborg Machine for the greatest amount possible.

87.     On June 22, 2020, after not receiving any feedback regarding the documents sent to MSS on June 4, 2020, OWC followed up with MSS and circulated a slightly-amended version of the purchase agreement and promissory note updating it with the amounts established in the SG Appraisal. This version included terms regarding the sale of the Nyborg Machine consistent with what was discussed during the June 16, 2020 phone call. A true and accurate copy of the June 22, 2020 email is attached as Exhibit G and is incorporated herein by reference.

88.     OWC followed up with MSS again on June 25, 2020 and on July 2, 2020 requesting a date by which MSS would respond to the purchase agreement and promissory note first circulated nearly a month earlier.

89.     On July 3, 2020, OWC received from MSS a redlined purchase agreement and promissory note. The version that MSS circulated included countless terms that the Operating Agreement does not require, including, among other things, a release of all claims that OWC has against MSS, Atre's Estate, the Tushar Atre Trust, AtreNet, Highview LLC, and other entities and individuals and a requirement that OWC pay MSS an additional $260,000 beyond

14

what was set forth in the SG Appraisal. The version also included revisions to the terms that OWC included in the original draft with respect to the Nyborg Machine, but still reflected the agreement in principle that the parties reached as to how to address the Nyborg Machine. A true an accurate copy of MSS's July 3, 2020 email and redlined purchase agreement is attached as Exhibit H to this Complaint and is incorporated herein by reference.

90.     On July 13, 2020, OWC responded to MSS and provided a redlined agreement in response. In that response, OWC made clear that this is a "forced sale and [MSS's] obligation to sell is compulsory" and that "OWC is not in a position to add many of the provisions that [MSS] included in [its] last draft." The redlined purchase agreement also revised terms to conform to what the parties previously discussed regarding the Nyborg Machine. A copy of the July 13, 2020 email from OWC and related redlined purchase agreement is attached as Exhibit I and is incorporated herein by reference.

91.     On July 20, 2020, counsel for MSS and OWC spoke to discuss closing the transaction. During that call, OWC informed MSS that it would not agree to release MSS or non-parties since that was not required under the Operating Agreement. OWC also stressed the importance of finalizing the transfer of MSS's membership interest as soon as possible, and MSS indicated that it would try to respond that day.

92.     However, MSS did not respond to OWC's comments with respect to the purchase agreement for nearly two weeks.

93.     On August 3, 2020, counsel for OWC and MSS discussed the purchase agreement, and MSS reiterated its requests to include provisions and other terms that OWC was not required to provide. This included the releases of MSS and other third parties. As of this date, MSS had not provided a redlined purchase agreement since July 3, 2020 and did not provide any date by which it would respond, much less agree to turn over its membership interest.

94.     On the evening of August 3, 2020, the MSS-Appointed Managers noticed a board meeting for August 6, 2020. The agenda for that meeting called for the "review and approval of attached resolutions" and the "review of the attached list of payables." A true and

accurate copy of the board meeting notice is attached as Exhibit J and is hereby incorporated by reference into this Complaint.

95.     The draft of proposed resolutions included resolutions such as:

- "the Company's ownership is currently unchanged . . . ," even though the ownership was required to be changed nearly a month prior;

- "any person who is an employee or who would be deemed to be an employee . . . be terminated," although MSS has no real interest in Interstitial Systems operations at this point;

- "the Company pay, and ensure that any past due amounts are paid, due and payable indebtedness owed by the Company pursuant to any loan agreement or promissory note," which ambiguously is referring to a promissory note formerly with Atre, something that MSS can pay over time;

- "the Company . . . cause Company funds to be used to pay all of the foregoing," which refers to, at least in part, the payments that MSS included in list of payables attached to the notice – many of which OWC objects to as described below.

96.     With respect to the list of payables attached to the board meeting notice, nearly every item involved payments that the MSS-Appointed Managers claimed were owed to Atre's Estate, the Tushar Atre Trust, the Trustee of Atre's Estate (Shaku Atre), AtreNet (a company that Atre's Estate owns and controls), HighView (a company that Atre's Estate owns and controls); and Fern Street Blues (a company that Atre's Estate owns and controls).

97.     In fact, of the list of payables, around $650,000 of payables were identified as going to Atre or MSS-related entities.  OWC strongly objects to these payables as at least some are not owed and have not been verified or documented and the timing of the payments would negatively impact the ability of Interstitial Systems to ever operate.

98.     As one example, MSS includes $300,626 it claims is owed to Fern Street Blues for rent at a rate of $15,000 per month, but the only signed lease provides that rent is $7,500 per month. MSS has admitted that no other signed lease exists.

THOITS LAW

99. OWC objected to the notice on the grounds that the MSS-Appointed Managers should not be on Interstitial Systems' board since they would have already been removed had MSS complied with its legal obligation, acted in good faith and in accord with the terms in the Operating Agreement, and turned over its membership interest. OWC also disputed many, if not all, of these payments since it is unclear whether the amounts owed are legitimate and since Interstitial Systems' board had not yet approved a budget as mandated under the Operating Agreement.

100. On August 4, 2020, after it became apparent that MSS's delays with respect to turning over its membership interest in exchange for the promissory note as the Operating Agreement mandated were due to the fact that it wanted to continue to exert influence over Interstitial Systems and, among other things, force disputed payments to other entities sharing the same owner as MSS (Atre's Estate), OWC demanded that MSS sign a simple, one-page purchase agreement memorializing the transfer of membership interest by the close of business on August 5, 2020. A true and accurate copy of OWC's August 4, 2020 email to MSS, along with the draft of the purchase agreement and promissory note, is attached as Exhibit K and is incorporated herein by reference.

101. MSS did not comply with this demand.

102. Instead, on August 7, 2020, after the meeting was delayed by one day, MSS moved forward with the board meeting at which the MSS-Appointed Managers approved unnecessary and self-interested resolutions as well as over $600,000 in payments to Atre's Estate, Atre's Trust, and MSS-controlled entities over OWC's strong objections.

103. On August 14, 2020, MSS sent OWC a letter in which MSS stated, among other things, that "the appraisal is incomplete" because the SG Appraisal did not include an appraisal of the Nyborg Machine. Although the SG Appraisal was issued more than two months earlier, this is the first time that MSS informed OWC of its position.

104. On August 19, 2020, one day after OWC initiated this litigation, MSS finally responded to the draft of the purchase agreement that OWC circulated back on July 13, 2020 and circulated a new redlined draft. The new draft contained minor revisions to the provisions

with respect to the Nyborg Machine and omitted provisions requiring payment to MSS beyond those required by the Operating Agreement. However, despite OWC's prior statements regarding the releases, MSS re-inserted the release provisions not mandated under the Operating Agreement that would operate to release MSS, Atre's estate, the Tushar Atre Trust, AtreNet Inc., and Highview LLC from all claims that OWC has, known or unknown, against them. A true and accurate copy of MSS's August 19, 2020 letter and purchase agreement are attached as Exhibit L and is incorporated herein by reference.

105. On August 20, 2020, OWC responded to MSS's August 19th letter and draft purchase agreement. In the cover letter, OWC stated, as it had many times before, that:

> OWC is not going to agree to a release as part of the purchase agreement as the Operating Agreement does not require it. Nor is OWC willing to agree to the attorneys' fees provision for the same reason. Outside of that, the purchase agreement is fine.

> There is no reason for MSS to continue delaying the transfer of its membership interest. Please advise immediately when MSS will sign the purchase agreement.

OWC enclosed a redlined purchase agreement accepting all language that MSS had proposed regarding the Nyborg Machine and deleting the two terms referenced in the cover letter that were not required under the Operating Agreement. A true and accurate copy of OWC's August 20, 2020 letter and redlined purchase agreement is attached as Exhibit M and is hereby incorporated by reference.

106. As of August 20, 2020, given that the parties had not only agreed in principle on what to do with the Nyborg Machine, but they also agreed on contractual language, that issue was resolved as of that date.

107. On September 8, 2020, after MSS failed to respond to OWC's August 20, 2020 letter or the draft purchase agreement circulated at that time, OWC followed up inquiring as to why MSS had not responded, inquiring why it has not signed the purchase agreement, and explained that "time is of the essence" and the delays "are unacceptable and damaging to both OWC and Interstitial Systems. OWC also stated that, although it disagrees that the Nyborg Machine issue is an open issue given the parties' agreement on that issue, it proposed:

THOITS LAW

(1) MSS pay OWC $63,750 (42.5% of the $150,000 valuation that Aptia prepared of the machine) in exchange for taking immediate possession and ownership of the Nyborg machine, or (2) OWC pay MSS $86,250 (57.5% of the $150,000 valuation that Aptia prepared of the machine) for complete ownership of the machine. In other words, if MSS thinks a $150,000 valuation is too high, then OWC will buy MSS's share at that valuation. On the other hand, if MSS thinks a $150,000 valuation is too low, then it can buy OWC's share at the same valuation.

A true and accurate copy of OWC's September 8, 2020 letter is attached as Exhibit N and is incorporated by reference into the Complaint.

108.    On September 14, 2020, after not receiving a response to its September 8, 2020 letter, OWC followed up, again stated that OWC understood that the parties had previously agreed on how to address the Nyborg Machine, and advised that, if MSS was going to go back on that agreement, OWC was fine with the two options proposed in the September 8, 2020 letter as well as advise Seigneur Gustafson to engage an appraiser for the Nyborg Machine. A true and accurate copy of the September 14, 2020 letter is attached as Exhibit O and is hereby incorporated by reference into the Complaint.

109.    In response, MSS has advised OWC that it will not move forward with any options referenced in OWC's September 8th and September 14th letters and would not address that issue unless OWC would agree to release MSS and multiple third-parties, including Atre's Estate, the Tushar Atre Trust, AtreNet, and Highland LLC.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract Against MSS)**

110.    OWC realleges each and every allegation previously referenced in this Complaint.

111.    The Operating Agreement is a valid and enforceable contract.

112.    At all times, OWC has performed its obligations under the Operating Agreement.

19

113. Pursuant to the Operating Agreement, MSS is required to transfer its membership interest to OWC at the Appraised Value in exchange for a promissory note as detailed in Section 6(d)(i) of the Operating Agreement, and pursuant to Section 6.1(f) of the Operating Agreement, this transaction must take place within 30 days of the appraisal being completed.

114. Seigneur Gustafson completed and published the SG Appraisal on June 9, 2020, establishing that "the Fair Market Value of a 100% ownership interest in Interstitial Systems, LLC as of October 1, 2019 is $4,500,000."

115. The SG Appraisal excluded the Nyborg Machine, but the parties resolved that issue by at least August 20, 2020 when OWC informed MSS that it agreed on the terms it proposed with respect to the Nyborg Machine.

116. In accord with the provision of the Operating Agreement, MSS was required to transfer its membership in exchange for the promissory note by no later than September 18, 2020.

117. However, MSS has not transferred its membership interest, has indicated that it no longer wishes to abide by the parties' agreement on how to address the Nyborg Machine, and has taken the position that the Nyborg Machine is still an open issue.

118. Despite taking this position, MSS has also indicated to OWC that it will not take any steps to address that issue, including, among other things, proceeding with an appraisal of the Nyborg Machine.

119. MSS has stonewalled OWC and refuses to move the process forward, and by doing so, MSS has breached the Operating Agreement by failing to comply with the procedures set forth in the Operating Agreement, by effectively prohibiting the transfer of its membership interest in Interstitial Systems, and by not actually transferring its membership interest.

120. As a direct and proximate result of MSS's breach of the Operating Agreement, OWC has been prevented from owning a controlling interest in Interstitial Systems, has been prevented from removing the MSS-Appointed Managers and from taking control of Interstitial Systems in order to salvage its investment in the company, and has been subject to decisions

20

1 that MSS and the MSS-Appointed Managers have made that will adversely impact Interstitial

2 Systems in the future even though MSS has no real interest in the company given the value of

3 its membership interest is locked in at the Appraised Value.

4     121.   OWC has incurred harm due to MSS's breach that will, among other things,

5 adversely impact OWC's membership interest, and has prevented OWC from taking necessary

6 business decisions and from operating Interstitial Systems going forward. Therefore, while

7 OWC has incurred damages, it also lacks an adequate legal remedy against MSS for its actions.

8     122.   Furthermore, as set forth in Section 13.5 of the Operating Agreement, MSS has

9 acknowledged that its failure to comply with the contract will result in irreparable harm and

10 that specific performance is necessary to remedy MSS's breach.

11     123.   Accordingly, OWC is entitled damages and to specific performance mandating

12 that MSS turn over its membership interest in Interstitial Systems immediately in exchange for

13 the promissory note as unequivocally required by the Operating Agreement.

14
15                 **SECOND CLAIM FOR RELIEF**
      **(Breach of Good Faith and Fair Dealing Against MSS)**

16     124.   OWC realleges each and every allegation previously referenced in this

17 Complaint.

18     125.   The Operating Agreement is a valid and enforceable contract.

19     126.   At all times, OWC has performed its obligations under the Operating

20 Agreement.

21     127.   Pursuant to the Operating Agreement and under California law, a covenant of

22 good faith and fair dealing is implied in the Operating Agreement such that MSS was, among

23 other things, prohibited from doing anything that prevents OWC from obtaining and realizing

24 the fruits of the Operating Agreement.

25     128.   From the point in time that OWC exercised its option to purchase MSS's

26 membership interest, MSS has engaged in a pattern of conduct to delay turning over its

27 membership interest to OWC in order to retain control of Interstitial Systems and to create

28 leverage to obtain releases for it, the MSS-Appointed Managers, and other third parties and

with respect to disputes with OWC over money and assets outside of the Appraised Value to which MSS and its owner believe that they are entitled. This is particularly true of the events that have transpired since the Appraised Value was established on June 9, 2020.

129. This conduct includes, but is not limited to, the following:

(a) MSS agreeing on terms to address the Nyborg Machine and then refusing to comply with those terms;

(b) Refusing to inform OWC of its position that the SG Appraisal was incomplete for purposes of the Operating Agreement until August 14, 2020, nearly two months after the appraisal was issued;

(c) Repeatedly delaying responses to OWC regarding the purchase agreement and related issues;

(d) Refusing outright and/or negotiating in bad faith with respect to options that OWC has presented with respect to resolving the value of the Nyborg Machine;

(e) Indicating that it will only proceed with the process of transferring its membership interest if OWC agrees to release MSS and other third-parties, none of which is required under the law or the Operating Agreement;

(f) Refusing to offer any path forward and still withholding its membership interest in Interstitial Systems 9 months after OWC exercised its option under the Operating Agreement and more than 3 months after the SG Appraisal was issued.

130. In light of MSS's repeated delays, its unwillingness to cooperate, its insistence on receiving releases from OWC as a condition to the transfer, and its refusal to turn over its membership interest in Interstitial Systems while continuing to make business decisions solely in MSS's self-interest and over OWC's objections, MSS has breached the duty to act in good faith and fair dealing that it owes to OWC.

131. As a direct and proximate result of MSS's breach of the Operating Agreement, OWC has been prevented from owning a controlling interest in Interstitial Systems, has been prevented from removing the MSS-Appointed Managers and from taking control of Interstitial Systems in order to salvage its investment in the company, and has been subject to decisions that MSS and the MSS-Appointed Managers have made that will adversely impact Interstitial

Systems in the future even though MSS has no real interest in the company given the value of its membership interest is locked in at the Appraised Value.

132.    The type of harm that OWC has incurred due to MSS's breach will impact OWC and its ability to operate Interstitial Systems going forward. Therefore, while OWC has incurred damages, it also lacks an adequate legal remedy against MSS for its actions.

133.    Furthermore, as set forth in Section 13.5 of the Operating Agreement, MSS has acknowledged that its failure to comply with the contract will result in irreparable harm and that specific performance is necessary to remedy MSS's breach.

134.    Accordingly, OWC is entitled to damages and to specific performance mandating that MSS turn over its membership interest in Interstitial Systems immediately in exchange for the promissory note as unequivocally required by the Operating Agreement.

### THIRD CLAIM FOR RELIEF
### (Declaratory Relief Against MSS)

135.    OWC realleges each and every allegation previously referenced in this Complaint.

136.    For reasons set forth above, OWC has the legal right to purchase MSS's membership interest as set forth in detail in the Operating Agreement.

137.    Therefore, OWC's position is that it is legally entitled to MSS's membership interest in Interstitial Systems, that MSS must cooperate to effectuate that transfer by not delaying the process and by either honoring the deal it previously reached regarding the Nyborg Machine or by proceeding immediately with an appraisal of the Nyborg Machine, and the transfer of MSS's membership interest is not conditioned on providing a release for MSS, Atre, the Tushar Atre Estate, and other third parties.

138.    MSS, on the other hand, has taken the position that it is not legally required to transfer its membership interest in Interstitial Systems at this time, it does not need to cooperate or proceed in any way with addressing the Nyborg Machine, and that OWC must provide a release to MSS, Atre, the Tushar Atre Estate, and other third parties as a condition of the transfer.

139    As a result, a material and genuine controversy exists between the parties as to MSS's continued rights, if any, under the Operating Agreement, and there is a bona fide, actual, present, practical, and urgent need to resolve this controversy.

140.    Accordingly, OWC seeks and is entitled to a declaration that:

(a)    OWC is legally entitled to MSS's membership interest per the terms of the Operating Agreement;

(b)    MSS must either agree on a value for the Nyborg Machine or agree to have it appraised within 3 days;

(c)    MSS must transfer its interest within 7 days after an agreement is reached on the value of the Nyborg Machine or after the appraisal is issued on the Nyborg Machine;

(d)    The Operating Agreement does not require OWC to provide a release to MSS, to the MSS-Appointed Managers, or to any other third party, and therefore, OWC does not have to provide a release in exchange for MSS's membership interest.

141.    OWC is also legally entitled to this relief as well as any and all costs and fees arising from this dispute and any other relief that this Court may deem is proper.

### FOURTH CLAIM FOR RELIEF
**(Tortious Interference Against the MSS-Appointed Managers)**

142.    OWC realleges each and every allegation previously referenced in this Complaint.

143.    At all times, the MSS-Appointed Managers were aware that the Operating Agreement was in existence and served as a legally binding contract between MSS and OWC.

144.    From the time that OWC exercised its right under the Operating Agreement to purchase MSS's interest in Interstitial Systems on November 27, 2019, the MSS-Appointed Managers did everything in their power to frustrate and prevent OWC from obtaining MSS's interest in Interstitial Systems even though the Operating Agreement requires it.

145.    Similarly, the MSS-Appointed Managers have taken actions to attempt to secure funds and assets from Interstitial Systems despite such actions being an obvious conflict of interest for the MSS-Appointed Managers and are no way in the best interest of Interstitial

Systems. They also continue to withhold documents and computers that MSS confiscated in November or obtained from the police in order to hide and conceal the actions of Atre while he was operating Interstitial Systems. They have also taken actions to ensure that they maintain their Manager positions with Interstitial Systems knowing that, once OWC rightfully acquires MSS's shares, they will be replaced. All of these actions have and will continue to injure OWC's membership interest and OWC's ability to assert its rights under the Operating Agreement.

146. By taking such actions, the MSS-Appointed Managers are enabling, incentivizing, and delaying the turning over MSS's membership interest in OWC. Their actions are taken in their own self-interest or in the interest of Atre's estate or other entities, and they result in a conflict of interest. The MSS-Appointed Managers have thus acted in their personal capacity with respect to their interference with the Operating Agreement.

147. In all of these ways, the MSS-Appointed Managers have induced, hindered, and/or disrupted MSS from performing its obligation to act in good faith under the Operating Agreement to take efforts to turn over its membership interest in Interstitial Systems to OWC as the Operating Agreement clearly requires.

148. The actions of the MSS-Appointed Managers with respect to this dispute and as set forth in the preceding allegations were and continue to be malicious, intentional, reckless, and grossly negligent such that they were made with reckless indifference to the rights of others or were an intentional or wanton violation of those rights.

149. As a result of the actions of the MSS-Appointed Managers, MSS has breached its obligations under the Operating Agreement by not transferring its membership interest to OWC per the terms of the Operating Agreement and by not complying with its duty of good faith and fair dealing owed to OWC under the Operating Agreement.

150. Accordingly, the MSS-Appointed Managers have tortiously interfered with the Operating Agreement, and as a direct and proximate result of their actions, they have caused OWC harm by preventing it from owning a controlling interest in Interstitial Systems, preventing OWC from removing the MSS-Appointed Managers, preventing OWC from taking

25

control of Interstitial Systems and making business decisions in order to salvage its investment in the company, and making OWC subject to decisions that MSS and the MSS-Appointed Managers have made that will impact Interstitial Systems in the future.

151.     As such, OWC lacks an adequate remedy at law for MSS-Appointed Managers' tortious conduct and such conduct has caused and will continue to cause irreparable harm to OWC in the future.

152.     Accordingly, OWC is entitled damages and to injunctive relief.

**FIFTH CLAIM FOR RELIEF**
**(Civil Conspiracy Against the MSS-Appointed Managers)**

153.     OWC realleges each and every allegation previously referenced in this Complaint.

154.     At all times since November 27, 2019, the MSS-Appointed Managers, acting in their individual capacities, agreed to engage in a conspiracy to interfere with the Operating Agreement and to encourage and procure MSS's breach of that contract by causing MSS to withhold the membership interest despite being obligated to transfer that interest to OWC in exchange for the promissory note.

155.     The MSS-Appointed Managers' scheme was intentional and purposeful because preventing MSS from turning over its membership interest to OWC prevented OWC from taking control over Interstitial Systems and prevented the removal of the MSS-Appointed Members which permitted them to continue to act for the benefit of Atre's Estate and to take actions out of spite and other self-interested actions that solely benefit Atre's Estate and other commonly owned entities.  These include, but are not limited to, the actions that were taken at the August 7, 2020 board meeting, refusing to complete LiveScans necessary to obtain or maintain necessary licensing, and their refusal to return documents and computers that MSS confiscated in November or later obtained from the police in order to hide and conceal the actions of Atre while he was operating Interstitial Systems.

156.     As such, OWC lacks an adequate remedy at law for MSS's and MSS-Appointed Managers' tortious conduct and such conduct has caused and will continue to cause irreparable harm to OWC in the future.

157.     Accordingly, OWC is entitled damages and to injunctive relief.

## SIXTH CLAIM FOR RELIEF
### (Fraud Against MSS)

158.     OWC realleges each and every allegation previously referenced in this Complaint.

159.     In Atre's March 26, 2019 and April 22, 2019 emails, MSS confirmed representations that were made to OWC prior to its initial investment in Interstitial Systems and further represented in those emails that the Cannabis software was one of the "legs" of Interstitial Systems' business.

160.      MSS's representations regarding the Cannabis software, though, were false as Interstitial Systems did not own the Cannabis software that MSS referenced in its emails.

161.     MSS made these misrepresentations with the intent to deceive OWC and to induce OWC into making additional investments in Interstitial Systems.

162.     Relying on MSS's representations regarding the Cannabis software, OWC made additional investments in Interstitial Systems in the amount of $1.5 million.

163.     OWC reasonably and justifiably relied on MSS's misrepresentations regarding the Cannabis software as MSS never informed OWC that Brian Kenny, not Interstitial Systems, owned the Cannabis Software.

164.     Furthermore, had OWC known that Interstitial Systems did not own the Cannabis software, OWC would not have made the additional investments in Interstitial Systems, especially at the valuation that it did.

165.     OWC's investments that it made in Interstitial Systems were worth and continue to be worth much less than the value that OWC received when it made the additional investments in Interstitial Systems in April and May of 2019.

166. Accordingly, as a direct and proximate cause of MSS's fraud, OWC has been damaged in an amount greater than $75,000 that will be determined by the trier of fact.

167. Moreover, MSS's actions were intentional, malicious, deceptive, and made with the intent to harm MSS, and as a result, OWC is also entitled to recover punitive damages in an amount determined by the trier of fact.

### SEVENTH CLAIM OF RELIEF
### (Constructive Fraud Against MSS)

168. OWC realleges each and every allegation previously referenced in this Complaint.

169. Interstitial Systems is a closely-held limited liability company such that its members, OWC and MSS, are in a fiduciary relationship.

170. Despite being in a fiduciary relationship with OWC, from February 22, 2019 until May when OWC made its second investment in Interstitial Systems, MSS did not disclose and actively concealed the facts that:

      (a)    Brian Kelly and Brian Kenny, the two most important members of the leadership team at Interstitial Systems, separated from Interstitial System and were no longer working with Interstitial Systems;

      (b)    Brian Kelly and Brian Kenny were not members of MSS and had no ownership interest – whether it be direct or indirect – in Interstitial Systems;

      (c)    Interstitial Systems did not own the Cannabis Software that was previously presented to OWC as part of Interstitial Systems' business;

      (d)    Atre and MSS were using Interstitial Systems and its resources to support Atre's personal activities at the Summit Property;

      (e)    Atre and MSS were involved with black market activities at the Summit Property; and

      (f)    Atre and MSS were using Interstitial Systems and its resources to develop processes and equipment for the facility in Salinas, which had nothing to do with Interstitial Systems.

171.    MSS intentionally concealed these material facts in order to, among other things, deceive OWC and to induce it into making additional investments in Interstitial Systems.

172.    OWC reasonably and justifiably relied on MSS's concealment and non-disclosures such that OWC would not have made additional investments totaling $1.5 million in Interstitial Systems in April and May of 2019 had MSS disclosed the truth of those matter to OWC and had not concealed those facts.

173.    As a direct and proximate result of MSS's fraudulent actions, OWC was fraudulently induced into making the $1.5 million investment and has incurred damages of at least $1.5 million.

174.    Accordingly, OWC is entitled to damages as a result of MSS's fraudulent actions in the amount of at least $1.5 million.

175.    Moreover, MSS's actions were intentional, malicious, deceptive, and made with the intent to harm MSS, and as a result, OWC is also entitled to recover punitive damages in an amount determined by the trier of fact.

## EIGHTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against MSS)

176.    OWC realleges each and every allegation previously referenced in this Complaint.

177.    Under applicable law, as a member of Interstitial Systems, MSS owed fiduciary duties to OWC to:

(a)     comply with the terms of the Operating Agreement;

(b)     not misappropriate Interstitial Systems' property and resources;

(c)     refrain from dealing with Interstitial Systems in a way that is adverse to Interstitial Systems; and

(d)     refrain from competing with Interstitial Systems.

THOITS LAW

178. MSS also is bound to discharge all of these duties in a manner that is consistent with the obligation of good faith and fair dealing as recognized under the law.

179. MSS, though, has breached the fiduciary duties that it owes to OWC by:

(a) taking measures to prevent, frustrate, and delay OWC's legal right to purchase MSS's membership interest in Interstitial Systems violation of the Operating Agreement;

(b) purchasing the Nyborg Machine without authorization of Interstitial Systems' Board in violation of the Operating Agreement;

(c) misappropriating OWC's investment in Interstitial Systems and other Interstitial Systems' resources to support the activities at the Summit Property and concealing that from OWC;

(d) misappropriating OWC's investment and Interstitial Systems' resources to support the Atre's facility in Salinas, which had nothing to do with Interstitial Systems, and concealing that from OWC;

(e) misappropriating OWC's investment and Interstitial Systems' resources by converting revenues for jobs performed for customers;

(f) misappropriating OWC's investment and Interstitial Systems' resources to purchase the Nyborg Machine in order to test it and the related technology out for use at the Salinas facility, generate goodwill to allow Atre to invest in Nyborg Systems, and allow Atre and Nyborg Systems to market the technology to other potential customers and concealing from OWC these facts;

(g) concealing from OWC that Brian Kelly and Brian Kenny had separated from Interstitial Systems and were no longer working with the company, that Atre and MSS were involved in illegal, black market activities, and that OWC did not own the Cannabis Software that was previously represented to OWC as being part of Interstitial Systems' business;

(h) dealing with Interstitial Systems in an adverse way by using OWC's investment and Interstitial Systems' resources to fund and support personal activities at the Summit Property and the Salinas facility, to fund and support the Nyborg Machine, and for other personal use; and

(i) taking measures, as noted in detail above, that are a conflict of interest, that compete with Interstitial Systems.

180. Had MSS not breached the fiduciary duties that it owes to OWC, OWC would have not made the investment in Interstitial Systems that it made in May of 2019.

30

181.     Moreover, OWC would have taken other actions that would have protected the investments that it has made.

182.     As a direct and proximate cause of MSS's breaches of fiduciary duty, OWC was damaged by has incurred damages exceeding $75,000, which will be determined by the trier of fact.

183.     Moreover, because MSS's actions were intentional, malicious, deceptive, and made with the intent to harm MSS, OWC is also entitled to recover punitive damages in an amount determined by the trier of fact.

## **PRAYER FOR RELIEF**

WHEREFORE, OWC is entitled to and prays for a judgment consisting of the following:

A.     Equitable relief in the form of a preliminary and permanent injunction:

(i)     Defendants Monterey Storage Solutions, LLC ("MSS"), Gil Spencer, Ben Rewis, and Christopher Lochhead and their agents, assigns or anybody acting on their behalf or in concert with them, are enjoined and restrained from

(a) taking any actions with respect to Interstitial Systems with respect to its ongoing operations, including but not limited to, taking board action with respect to payments they claim are owed to Atre's Estate, MSS, Fern Street Blues LLC, and any other entity controlled or owned by Atre's Estate;

(b) their continued disruption and interference with the Operating Agreement;

(c) withdrawing, transferring, or otherwise interacting with any bank account on which Interstitial Systems is a signatory or otherwise have withdrawal or access privileges;

(d) transferring, spending, encumbering, or otherwise disposing of property belonging to Interstitial Systems; and

(ii)     ordering

(a) MSS to transfer its membership interests to OWC by signing the purchase agreement that OWC circulated on August 4th to MSS

31

or something similar,

(b) OWC to sign the promissory note that OWC circulated on August 4th, and

(c) the parties to close that transaction and exchange fully executed documents within 3 business days; and

B.    A declaration that:

(i)    OWC is legally entitled to MSS's membership interest per the terms of the Operating Agreement;

(ii)   MSS must either agree on a value for the Nyborg Machine or agree to have it appraised within 3 days;

(iii)  MSS must transfer its interest within 7 days after an agreement is reached on the value of the Nyborg Machine or after the appraisal is issued on the Nyborg Machine; and

(iv)   The Operating Agreement does not require OWC to provide a release to MSS or to any other third party, and therefore, OWC does not have to provide a release in exchange for MSS's membership interest.

C.    Compensatory damages in an amount to be proven at trial but which exceeds $75,000.

D.    Punitive damages;

E.    Attorneys' fees and costs;

F.    Pre-judgment and post-judgment interest; and

G.    Any other relief that this Court deems just and proper.

## **JURY DEMAND**

OWC hereby demands trial by jury for this action.

Dated:  October 1, 2020

THOITS LAW

By:    */s/ Andrew Holland*

Andrew Holland
**Attorneys for Plaintiff**
**OWC SANTA CRUZ MFG LLC**

32